517 A.2d 75

**ANTIGUA CONDOMINIUM ASSOCIATION et al.**

**v.**

**MELBA INVESTORS ATLANTIC, INC. et al.**

**No. 31, Sept. Term, 1986.**

Court of Appeals of Maryland.

Nov. 12, 1986.

702

**704**

Barry L. Steelman and Kevin Thornton (Kaplan, Kaplan & Steelman, on the brief), Baltimore, for appellants.

Judith D. O'Neill and Steven M. Caplan, Weinberg & Green, Baltimore, for Bankers Trust Co.

Jonathan D. Claiborne, Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, for Melba Investors Atlantic, Inc.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ., and MARVIN H.

SMITH, Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

RODOWSKY, Judge.

Principal among the many issues in this case are those involving limitations on claimed breaches of warranty and of covenant which were asserted by unit owners and their council against a residential condominium developer and its parent corporation. The issues were decided on motions to dismiss for failure of the complaint to state a claim.

Antigua Condominium (Antigua) is a fourteen-story structure containing 104 units on 1.84 acres in Ocean City, Maryland. The owners of forty-five units at Antigua (Unit Owners) and the Antigua council of unit owners (Council), hereinafter collectively "Plaintiffs," are suing Melba Investors Atlantic, Inc. (Melba) and Bankers Trust Company (Bankers), hereinafter collectively "Defendants." Bankers had been the construction lender to the original Antigua developer who defaulted before construction was completed. That borrower and Bankers agreed to a deed in lieu of foreclosure under which the property was conveyed to Melba, a wholly owned subsidiary of Bankers. Melba completed the construction at Antigua and was the original vendor of the units.

On September 24, 1981, the Council and the owners of thirteen Antigua units sued the Defendants in one of the former equity courts in the Eighth Judicial Circuit (Baltimore City). On November 23, 1981, the owners of other units at Antigua sued the Defendants in the same court. Both suits sought (1) money damages for alleged construction defects and (2) equitable relief, by way of confirmatory deeds and certificates of title. The trial court ordered the two classes of claims to be segregated into separate actions, one at law and the other in equity. The bill of complaint in the earlier filed action to which the Council was a party, having been amended to include all of the Plaintiffs and to

assert only claims for money damages, is the action now before us.[1]

Defendants responded to Plaintiffs' amended declaration by a motion for production of documents under former Maryland Rule 326.[2] This motion sought the sales contracts and deeds of each of the Unit Owners and the Antigua condominium declaration. Plaintiffs raised no objection to the motion and eventually filed the requested documents in court. Under Md.R. 326, then in effect, those written instruments thereby became part of Plaintiffs' amended declaration.[3]

The Defendants prepared from the deeds a schedule listing the Unit Owners chronologically by date of deed and indicating whether the deed was directly from Melba. Unit Owners who did not buy directly from Melba are called "nonoriginal purchasers." That schedule is attached to this opinion as Appendix A. Using this information the Defendants demurred with Melba arguing, *inter alia,* that the

---

1. The owners of forty-five units joined in the amended declaration filed February 15, 1983, an increase of thirty-two units over those included in the September 24, 1981, complaint. Because the November 23, 1981, complaint is not in the record in this action, we cannot determine when any given owner of the additional thirty-two units first sued. Consequently, we must assume that all of them had sued by November 23, 1981.

2. Former Rule 326 read:
 Where any cause of action or defense is founded upon a written instrument, any party shall, upon written demand of the opposite party served upon him within the time allowed for pleading, file in the proceedings such instruments or a true or photostatic copy thereof, which, when filed, shall be treated as if incorporated in the pleading. The time for pleading shall be extended until fifteen days after the filing of such instrument or copy.

3. Defendants' arguments to this Court assume, without contradiction by Plaintiffs, that once written instruments have been produced under former Md.R. 326 and have become part of a complaint by operation of the rule, the instruments continue to be part of any later amended complaint, without any need to refile the motion. We shall assume the same.

amended declaration on its face disclosed that limitations had run.[4]

Those demurrers were sustained with leave to amend. Plaintiffs then filed a second amended declaration to which Bankers again demurred and to which Melba filed a second demand for production of written instruments under former Md.R. 326. This second demand sought "[e]ach and every 'timely notice' of defect, breach of contract or breach of warranty given by any Plaintiff by certified mail ... or by personal delivery to Melba...."

The trial court issued an order sustaining Bankers' demurrer and prohibited the Plaintiffs from further amending as to that defendant. Although the court's order did not state its reasoning, its memorandum opinion sustaining Bankers' preceding demurrer had found the allegations insufficient to pierce Melba's corporate veil and to impose liability on Melba's sole stockholder, Bankers.

On July 1, 1984, the current Maryland Rules of Procedure came into effect and former Md.R. 326 was rescinded. On July 26, Plaintiffs filed five letters as their answer to Melba's motion to produce written instruments. Melba, on August 27, filed a "demurrer" based on limitations to Plaintiffs' second amended complaint. Before any ruling on that "demurrer" Plaintiffs filed a "revised second amended declaration" on December 3, 1984, *i.e.,* a third amended complaint. Melba countered with a "motion ne recipiatur and to strike, renewal of demurrer and third demurrer", filed December 7. The trial court, with memorandum opinion, granted Melba's motions without leave to amend.

The Court of Special Appeals affirmed in part and reversed in part. *Antigua Condominium Association v. Melba Investors Atlantic, Inc.,* 65 Md.App. 726, 501 A.2d 1359 (1986). We granted cross-petitions for certiorari.

---

**4.** *But see Hoover v. Williamson,* 236 Md. 250, 203 A.2d 861 (1964) (decided under the former Maryland Rules).

## I. *The Allegations*

Plaintiffs allege that the condominium declaration was recorded July 25, 1977, that the first sales of units were made in August, that the first deeds of units by Melba were made on September 17, 1977, and that control of the condominium Council passed from the Defendants to the owners of units on October 7, 1978. In selling units at Antigua, Melba used a standard form of contract containing the following provisions which are central to the instant controversy:

> The building has been erected on the land, at Seller's cost and expense, and, except to the extent otherwise expressly provided herein, conforms substantially to the construction plans and specification (construction plans).... Seller is making certain additions to the building as shown on the drawings attached hereto.
>
> ....
>
> The condominium unit sold under this contract has been or is being constructed substantially in accordance with the construction evidence [*sic*] that Seller has fully complied with all its obligations hereunder and that Buyer has approved and accepts the condominium unit, building and property as they stand, "as is", and as being satisfactorily built, equipped and completed, and thereafter no further performance can or shall be required of Seller, except as follows: Seller will make any necessary repairs, adjustments or replacements to the condominium unit and item of personal property specified herein or the common elements of the condominium required as the result of faulty construction, faulty material, faulty manufacture or faulty installation, provided that notice of the defect shall be given Seller within a period of one (1) year accounting from the date of settlement under this Contract.

We shall call the immediately preceding provision the "Repair Clause."

Count one asserts claims on behalf of the Council, both for itself and as a representative of the Unit Owners. That count is predicated, at least in part, on the Repair Clause. Paragraph 11 of the count states that the Council, within the year following September 17, 1977, "notified the [D]efendants ... of all of the construction defects discovered in the common elements and in the individual units which defects are hereinafter detailed in paragraph 12." Paragraph 12 alleges a long list of defects (the ¶ 12 defects), including "[h]oles and cracks in walls causing severe water damage into the common elements and into the individual [units.]" Paragraph 11 further alleges "[t]hat from the time of the first such notice of defect through May 6, 1980, the Defendants received all notices of defects and agreed to repair all defects.... [and] actually started making repairs to correct the water seepage into the units and common elements[.]"

Paragraph 11 goes on to say that the Council first learned of the Defendants' intentions concerning repairs by a letter of May 6, 1980, from Melba. That letter is an exhibit to the complaint. In the letter Melba responds to eight categories of complaints which had apparently been made in a letter of September 10, 1979, by the Council. With respect to *"Waterproofing,"* Melba replied:

The resealing of the building resumed on April 10, 1980 after a winter recess, and we have been advised by the contractor that the work should be completed within two or three weeks depending on weather conditions. At the same time another contractor, Clifton Gray and his crew has been working incessantly throughout the winter correcting water related damages within each unit and has assured us that the interior work will be completed in 3 to 4 weeks. Also we have a project engineer who monitors the quality of the work and its progress. In light of the above, the concern expressed by the Board about "delays" appears unfounded and unjustified since we wasted no time at all in moving toward completion.

With respect to the other seven categories of alleged defects the May 6, 1980, letter denied that Melba had any obligation to repair them. Melba's letter concluded by saying: "We further feel that the warranty work which has been on going for quite some time extended far beyond our legal obligation."

Count one is followed by ninety-three more counts in the complaint. Each of them, from count two through count ninety-four, incorporates the first twelve paragraphs of the complaint wherein are found the allegations reviewed above. Counts two through four also claim damages for the ¶ 12 defects.

In count two the Council, for itself and in a representative capacity, claims damages on the theory that the ¶ 12 defects constitute breaches of express and implied warranties. Count three undertakes to claim for all of the Unit Owners based on the Repair Clause with respect to the ¶ 12 defects. In count four all Unit Owners allege breaches of express and implied warranties because of the ¶ 12 defects.

Counts five through ninety-four present the claims of specific Unit Owners and allege, unit by unit, defects in addition to the ¶ 12 defects. Water damage to the particular unit involved is alleged in each of these counts. The odd numbered counts assert breach of the standard sales contract while the even numbered counts rest on express and implied warranties. Other than by incorporating complaint paragraphs one through twelve, counts five through ninety-four contain no allegations about notice having been given by the respective Unit Owners.

The Court of Special Appeals affirmed dismissal on limitations grounds of all claims against Melba other than those claims which (1) sought damages for other than ¶ 12 defects, (2) were based on breach of the Repair Clause, and (3) had been brought by Unit Owners who took title on or after September 22, 1977. Finding the latter claims timely on the allegations, the intermediate appellate court reversed and remanded as to them. Judgment for Bankers nevertheless

was affirmed because the complaint failed to allege any basis for piercing Melba's corporate veil.

## II. *Claims Against Melba*

### A. *The Repair Clause Claims*

Central to the Court of Special Appeals' limitations analysis of the Repair Clause claims is the allegation in ¶ 11 of the complaint that the Council had given notice of the ¶ 12 defects within one year after September 17, 1977. That meant that all ¶ 12 defects were known to the Plaintiffs no later than September 18, 1978. The action was not filed until more than three years thereafter, on September 24, 1981. Under the general statute of limitations "[a] civil action at law shall be filed within three years from the date it accrues...." Md.Code (1974, 1984 Repl.Vol.), § 5–101 of the Courts and Judicial Proceedings Article. The intermediate appellate court concluded that claims based on breach of the Repair Clause and seeking damages for the ¶ 12 defects (*i.e.,* counts one and three) had accrued on or before September 18, 1978, and were barred. This analysis postulates that accrual for limitations purposes of the cause of action for breach of the Repair Clause cannot occur later than the time when a Plaintiff discovers a defect covered by the Repair Clause and implicitly reasons that discovery had to have occurred on or before the date of notice.[5]

The Court of Special Appeals also concluded that breach of contract claims brought by Unit Owners for damage to particular units were not controlled by the allegation that notice of all ¶ 12 defects had been given to Melba by

---

5. Under this analysis, if correct, the defense of limitations clearly appeared from the face of the complaint and the defense could properly be raised by a motion to dismiss under MD.R. 2–322(b). *See Cross v. Lucius,* 713 F.2d 153 (5th Cir.1983); *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036 (10th Cir.1980); *Davenport v. Deseret Pharmaceutical Co.,* 321 F.Supp. 659 (E.D.Va.1971); 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 12.07 (2d ed. 1986); 5 C. Wright & A. Miller, *Federal Practice & Procedure* §§ 1357, 1360 (1969); *see generally* P. Niemeyer & L. Richards, *Maryland Rules Commentary* 149 (1984).

September 18, 1978. Paragraph 11 of count one, which was incorporated into all succeeding counts, additionally alleged that notice of defects had been given to Melba as late as May 6, 1980. The Court of Special Appeals interpreted this allegation, correctly in our view, to relate to defects other than the ¶ 12 defects. Under the allegation referring to May 6, 1980, one or more unspecified Unit Owners, acting in compliance with the Repair Clause, could have given notice to Melba on the last day of the one year notice period accounting from the date of settlement under that Unit Owner's sales contract. The court, working backwards from the actual date of institution of this action, then calculated in the following fashion the latest date on which a Unit Owner could have settled without having the claim barred by limitations.

September 24, 1981— date action instituted.

September 23, 1978— three years prior to institution of action and latest date for notice to Melba per the one year notice condition of the Repair Clause.

September 22, 1977— latest day on which a Unit Owner could have settled and given one year notice by no later than September 23, 1978.

The Court of Special Appeals reversed the dismissal by the circuit court of those counts in which a Unit Owner who had settled after September 22, 1977, claimed breach of the Repair Clause based on defects other than ¶ 12 defects.[6] As it had done in reviewing count one, the court equated the giving of notice by a Unit Owner with accrual for limitations purposes of a cause of action based on breach by Melba of the Repair Clause.

---

**6.** Thus counts seventeen, nineteen, and seventy-one, involving Unit Owners who had settled on the 17th and 19th of September, 1977, were excluded from the intermediate appellate court's reversal of the odd numbered counts beginning with count five. Also excluded were counts seven and sixty-five, involving nonoriginal purchasers whose grantors had initially settled for the units on September 17, 1977.

The Plaintiffs challenge this analysis. They say Melba gave more than a warranty of compliance with plans and specifications and against certain defects; Melba also promised to repair those defects. Plaintiffs say that the action for breach of the covenant to repair does not inexorably accrue, as a matter of law, on the day by which a Unit Owner must have discovered a defect as evidenced by the giving of notice of the defect. There also must be, following notice, a reasonable time within which Melba can perform. Failure to render that performance is the breach which fixes the time of accrual and begins the running of limitations.

Melba says the Repair Clause is, "simply, [its] promise to sell the Condominium to [Plaintiffs] constructed in accordance with the plans and specs[,]" with "a limitation upon the time afforded [Plaintiffs] to discover and notice claims ... and a conditioning of [Plaintiffs'] right of action under the single contractual obligation...." Melba submits that construing the contract to contain a second promise to repair, in addition to the guarantee, is as redundant as reading a promissory note to contain a second promise to pay in the event of default.

The dispute, at bottom, involves interpreting the contract. To review, the key provision reads:

> Seller will make any necessary repairs, adjustments or replacements to the condominium unit and item of personal property specified herein or the common elements of the condominium required as the result of faulty construction, faulty material, faulty manufacture or faulty installation, provided that notice of the defect shall be given Seller within a period of one (1) year accounting from the date of settlement under this Contract.

Literally this covenant is one to repair. The scope of the covenant to repair defines the scope of the defects against which it might be said that Melba guaranteed.

A provision indistinguishable from the Repair Clause involved here was interpreted in *President & Directors of*

*Georgetown College v. Madden,* 505 F.Supp. 557 (D.Md. 1980), *aff'd in part and appeal dismissed in part,* 660 F.2d 91 (4th Cir.1981). Paragraph 40 of Georgetown College's contract in part read: "The Contractor shall remedy any defects in the work and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of final acceptance of the work. . . ." The general contractor's bonding company argued that this provision contractually established a one year statute of limitations. Judge Kaufman, rejecting that contention, explained the provision:

> Paragraph 40, however, does not embody a limitations period. Instead, that contract provision sets forth an additional promise by the contractor that should defective work be discovered within one year, the contractor would repair the same. Refusal to repair such defective work would have resulted in a separate breach of contract aside from the breach resulting from the defective work. Paragraph 40 is, therefore, an additional remedy for the owner—a right to have the defective work repaired—and not a limitations period. *See Fowler v. A & A Co.,* 262 A.2d 344, 347–48 (D.C.1970); *see also Zellan v. Cole,* 183 F.2d 139 (D.C.Cir.1950). [505 F.Supp. at 564 n. 8.]

*Zellan v. Cole,* cited in *Georgetown College,* involved a contract to build a residence which provided that " 'the basement shall be dry and shall remain dry for a period of three years.' " In light of the conduct of the parties the court construed the provision as a promise to maintain a dry basement for that length of time. Under that construction "the statute of limitations began to run when the contractor abandoned his efforts" to cure and not when water was discovered in the basement. *Zellan,* 183 F.2d at 139.

The time at which limitations began to run on an action for breach of a contract like the Repair Clause also was decided in *Spinoso v. Rio Rancho Estates, Inc.,* 96 N.M. 5, 626 P.2d 1307 (Ct.App.), *cert. denied,* 96 N.M. 17, 627 P.2d 412 (1981). That contract provided:

> Seller agrees, at its sole cost and expense, to remedy any substantial defect in workmanship or materials of the structural components of the dwelling that shall be called to its attention by notice in writing from Purchaser on or before the first anniversary of the date of closing of title. [96 N.M. at 7, 626 P.2d at 1309.]

The purchasers gave notice on the date of closing and further notices four months, ten months, fourteen months, and thirty-four months after closing. The statute of limitations allowed suit to be brought within six years from the date the cause of action arose. During the three years following the first written notification of defects, the seller made various attempts at repair which were unsuccessful. Finally the seller refused to make further repairs and the purchaser sued. The court dispatched the seller's statute of limitations argument in a footnote, saying "the cause of action did not arise at the time the defect was first noted, but when defendant refused to cure the defect." *Id.* at 9 n. 3, 626 P.2d at 1311 n. 3.

■ We do not interpret the Repair Clause as simply a warranty of the condition of a unit or of the common elements as of the time of closing with a Unit Owner. Had Melba simply guaranteed the condition of the property as of the date of closing with a Unit Owner, any breach of that guarantee would necessarily occur at closing and, absent a special statute, the cause of action would accrue for limitations purposes when the breach was discovered. *See Poffenberger v. Risser,* 290 Md. 631, 431 A.2d 677 (1981). Here, however, Melba additionally promised to repair if notified timely. The breach of that covenant to repair does not occur at closing or necessarily when notice is given. Conceptually, the ways in which one who has contracted to repair could breach that contract include repudiating the obligation before any notice is given, or, after being on notice of the defect, failing to undertake the repairs within a reasonable time, expressly refusing to repair, or, after undertaking to repair, abandoning the work before completion. *See generally Beaudry Motor Co. v. New Pueblo*

*Constructors, Inc.,* 128 Ariz. 481, 626 P.2d 1113 (Ct.App. 1981); *Fowler v. A & A Co.,* 262 A.2d 344 (D.C.1970); *Bulova Watch Co. v. Celotex Corp.,* 46 N.Y.2d 606, 389 N.E.2d 130, 415 N.Y.S.2d 817 (1979).[7]

Our holding may be further explained by contrasting it to *Booth Glass Co. v. Huntingfield Corp.,* 304 Md. 615, 500 A.2d 641 (1985). There the owner of a newly constructed building claimed that a subcontractor who had installed exterior glass in the structure had been negligent in the original installation. The owner knew for more than three years prior to suit that the glass might have been negligently installed. We held the statute of limitations had run on the claim and had not been tolled by the subcontractor's efforts to repair the defects. In *Booth Glass* we were careful to point out that the owner had not based the action upon negligence in the repair process. "Nor was the suit in any way predicated upon a contract created by Booth's promise to Huntingfield to repair the leaks." 304 Md. at 621–22, 500 A.2d at 644. On the issue now under considera-

---

**7.** No party to the instant action contends that Plaintiffs' complaint in any way involves "goods" under the Uniform Commercial Code or that the Repair Clause is "a warranty [which] explicitly extends to future performance of the goods" as governed by Md. Code (1975), § 2–725(2) of the Commercial Law Article. For sale of goods cases construing contractual language of repair as a warranty of future performance for the breach of which limitations begin to run subsequent to the delivery date see *Standard Alliance Indust., Inc. v. Black Clawson Co.,* 587 F.2d 813 (6th Cir.1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979); *Space Leasing Assoc. v. Atlantic Bldg. Sys.,* 144 Ga.App. 320, 241 S.E.2d 438 (1977); *Cox Motor Car Co. v. Castle,* 402 S.W.2d 429 (Ky.Ct.App.1966); *Rochester Welding Supply Corp. v. Burroughs Corp.,* 78 A.D.2d 983, 433 N.Y.S.2d 888 (App.Div.1980). For sale of goods cases construing contractual language of repair as a warranty for the breach of which limitations begin to run on the date of delivery see *Ontario Hydro v. Zallea Sys.,* 569 F.Supp. 1261 (D.Del.1983); *Voth v. Chrysler Motor Corp.,* 218 Kan. 644, 545 P.2d 371 (1976); *Centennial Ins. Co. v. General Elec. Co.,* 74 Mich.App. 169, 253 N.W.2d 696 (1977); *Commissioners of Fire Dist. No. 9 v. American La France,* 176 N.J.Super. 566, 424 A.2d 441 (1980); *Ranker v. Skyline Corp.,* 342 Pa.Super. 510, 493 A.2d 706 (1985); *Poppenheimer v. Bluff City Motor Homes,* 658 S.W.2d 106 (Tenn.Ct. App.1983).

tion, Plaintiffs say limitations start on accrual of their action for breach of the contract to repair and, unlike *Booth Glass,* Plaintiffs do not rely on Melba's efforts at repair, in and of themselves, to defer or interrupt the running of limitations on an earlier accrued action.

Under our interpretation of the Repair Clause, limitations do not begin running at the time a defect is discovered. As a consequence, even though giving notice of a defect presupposes discovery of the defect, it does not follow that limitations cannot begin to run later than the date on which notice of a defect was given. After timely notice Melba was not required to repair instantly. There was a period of time during which Melba could investigate the problem and prepare to perform the actual repair work. That period affects when Plaintiffs should have discovered that Melba breached the Repair Clause.

■ Specifically, counts one and three allege notice to Melba of the ¶ 12 defects by September 18, 1978. Suit was filed September 24, 1981, by some Plaintiffs and on November 23, 1981, by other Plaintiffs. All Plaintiffs were in court within two months beyond three years from that September 18, 1978, notice to Melba. It further appears from Melba's May 6, 1980, letter that Melba's contractor had been working on the leak problem for some time prior to the winter of 1979–80. For all the record discloses, this could have been in response to a September 1978 notice. We cannot say on the basis of the facts alleged that any of the Plaintiffs should, as a matter of law, have discovered Melba's alleged breach of the Repair Clause within two months after Melba had been asked to repair the ¶ 12 defects.

■ The same analysis applies to the odd numbered counts wherein individual Unit Owners allege damage to their units by breach of the Repair Clause. The worst scenario for any Unit Owner involves the earliest closing which was held on September 17, 1977. That Unit Owner could have satisfied the condition of the Repair Clause by a

notice given as late as September 18, 1978. That Unit Owner's claim involves the same two month period as was explained above in relation to counts one and three. It cannot be said on motion to dismiss that the Unit Owners should have discovered Melba's alleged breach of the Repair Clause more than three years prior to suit.

For the foregoing reasons the claims asserted in all of the odd numbered counts are remanded.

## B. *The Notice Condition*

In its brief as cross-petitioner Melba submits that the Court of Special Appeals erred in remanding certain Unit Owners' Repair Clause claims after it had concluded that the Plaintiffs, by their May 6, 1980, allegation, might have satisfied the one year notice condition of the Repair Clause. As a matter of pleading, the general allegation in each odd numbered count that the Plaintiff had given the notice prescribed by the Repair Clause was sufficient. MD.R. 2–304(b) provides that "[i]n pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred."

To support its position Melba relies on the Plaintiffs' response to Melba's second motion under former Md.R. 326 which had called for production of the written notices. Because Melba asserts that the five documents produced were inadequate as notice, it urges that all Repair Clause claims should be dismissed, even if these claims pass muster under the statute of limitations.

Melba's argument presupposes that the writings produced on July 26, 1984, by the Plaintiffs became a part of the complaint, but former Md.R. 326 had been rescinded prior to the Plaintiffs' production. There is no rule in effect after July 1, 1984, which operates on the pleadings in the manner of former Md.R. 326. This Court's order of April 6, 1984, adopting the current rules provided that they "shall take effect and apply to all actions commenced on or after July 1, 1984, and insofar as practicable, to all actions then

pending[.]" The current rules could have been, but were not, applied "insofar as practicable" to Plaintiffs' July 26, 1984, filing if the trial court had treated it as a response by Plaintiffs to a motion pursuant to MD.R. 2–422 for the discovery of documents. But this Court cannot consider that the notice argument is supported by discovery documents in the absence of an initial decision by the trial court.

■ An argument to the circuit court in support of Melba's motion to dismiss the complaint based upon matters not in the pleading but in the record as discovery material would have invoked MD.R. 2–322(b). The relevant portion of that rule reads:

> If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 2–501, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 2–501. . . .

Thus, to have applied this rule, the circuit court would first have to have determined not to exclude the matter which was outside the pleading. The circuit court would then have to have given the Plaintiffs a reasonable opportunity to present, in a form suitable for consideration on summary judgment, additional pertinent material. *See generally* 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1366, at 678 (1969). We cannot exercise the discretions which are in the first instance committed to the trial court.

Further, even if the circuit court, treating the matter as if on summary judgment, had dismissed after following the procedure of MD.R. 2–322(b) and the Court of Special Appeals had affirmed, we would not agree that this record supports dismissal for lack of notice. Each count which claims breach of the Repair Clause alleges that the building leaks and that there has been water damage. One of the

documents produced by the Plaintiffs is a letter of September 21, 1979, from the Council to Melba which states its purpose to be "a clear identification of Antigua problems requiring resolution." Under the heading "WATER-PROOFING," the letter reads:

The exterior ecotex as well as many portions of the interior ecotex are flaking and many leaks are in evidence around caulked areas. The exterior is to be resurfaced, *work has already begun.* All work should be done in a manner to ensure continuous bonding of caulking and sealing material and present a uniform exterior appearance. It is understood that the refinishing and repainting of water-stained and damaged interior walls will be accomplished at the seller's expense upon completion. [Emphasis added.]

In the letter of May 6, 1980, from Melba to the Council, Melba advised, in part, that "[t]he resealing of the building resumed on April 10, 1980 after a winter recess, and we have been advised by the contractor that the work should be completed within two or three weeks depending on weather conditions."

These documents, on the very skimpy factual record before us, are sufficient to support an inference that Melba had some notice, at least with respect to the problem of leaks and water damage, and that Melba waived strict compliance with the condition precedent. One party to a contract, by continuing to perform after the other party is in breach of the contract, may waive the breach. *Pumphrey v. Pelton,* 250 Md. 662, 245 A.2d 301 (1968). Thus, a liability insurer may, by undertaking defense without a reservation of rights, waive the failure of the insured to give prompt notice of the accident. *See Columbia Casualty Co. v. Ingram,* 154 Md. 360, 140 A. 601 (1928); *London & Lancashire Indemnity Co. v. Cosgriff,* 144 Md. 660, 125 A. 529 (1924). Indeed, a party to a contract may waive the benefit of a provision specifying that waiver of the other party's breach is not a waiver of a succeeding breach. *See Pumphrey v. Pelton, supra.*

■ There is no merit to Melba's contention that the Plaintiffs, by arguing waiver in answer to Melba's lack of notice point, have violated MD.R. 885. Melba's notice argument first surfaced in its cross-petition for certiorari seeking review of the remand ordered by the Court of Special Appeals. Under these circumstances the Plaintiffs have not violated MD.R. 885. Melba also submits that the Plaintiffs cannot plead compliance with the condition precedent of notice and then argue waiver by Melba. We express no opinion on the validity of the underlying proposition. It is sufficient to note that this argument cannot apply here because Melba did not contend that there should be a dismissal for failure to give notice until it cross-petitioned for certiorari, when the Plaintiffs could not amend to allege a waiver theory.

We express no opinion as to whether nonoriginal purchaser Unit Owners may sue for alleged breach of the Repair Clause. That issue is not before us. In its brief as cross-petitioner Melba pointed out that twelve nonoriginal purchasers are Plaintiffs and then said:

> [Plaintiffs'] Special Appeals Brief raised no specific argument with the circuit court's silence on this issue in its sustaining of the Demurrer as to all claims. Melba thus presumed that those claims were not appealed and likewise did not address the non-original purchaser issue in its Brief. In accordance with Md.Rule 1085, the Court of Special Appeals likewise did not consider the "non-original" purchaser issue.

Although the opinion by the Court of Special Appeals did not address the rights of a nonoriginal purchaser under the Repair Clause, the mandate of the Court of Special Appeals allowed the contract claims of at least nine Unit Owners who are nonoriginal purchasers to proceed (counts five, nine, twenty-one, forty-one, forty-three, fifty-nine, sixty-one, eighty-three, and ninety-three). It therefore was incumbent upon Melba to raise the issue in its cross-petition and in its brief as cross-petitioner if Melba sought reversal of the

remand on the ground that nonoriginal purchasers could not sue on the Repair Clause.

## C. *Warranty Claims*

### 1. *Statutory Background*

Melba began conveying units at Antigua on September 17, 1977, and the latest closing by it involving a Plaintiff was on April 23, 1981. Throughout that period Title 10, Subtitle 2 of the Real Property Article (RP) provided and still provides for certain express and implied warranties in the sale of a newly constructed private dwelling unit. Title 11 of the Real Property Article is the Maryland Condominium Act, enacted by Ch. 246 of the Acts of 1981 effective July 1, 1981. It replaced the predecessor Horizontal Property Act. Title 11, in § 11–131, creates implied warranties on units and common elements in sales by condominium developers.

Title 10 express warranties may be created by a written affirmation of fact or promise, by a written description of the improvement, including plans and specifications, or by sample or model, all as provided in § 10–202.[8] The implied warranties created by § 10–203(a) are that:

[T]he improvement is:

 (1) Free from faulty materials;

---

**8.** Section 10–202 provides in relevant part:

 (a) *Creation of warranties.*—Express warranties by a vendor are created as follows:

 (1) Any written affirmation of fact or promise which relates to the improvement and is made a part of the basis of the bargain between the vendor and the purchaser creates an express warranty that the improvement conforms to the affirmation or promise.

 (2) Any written description of the improvement, including plans and specifications of it, which is made a part of the basis of the bargain between the vendor and the purchaser creates an express warranty that the improvement conforms to the description.

 (3) Any sample or model which is made a part of the basis of the bargain between the vendor and the purchaser creates an express warranty that the improvement conforms substantially to the sample or model.

(2) Constructed according to sound engineering standards;

(3) Constructed in a workmanlike manner; and

(4) Fit for habitation.

Limitations on actions based on Title 10 warranties are provided in § 10–204 which, prior to amendments in 1985 which are not relevant to the issues before us, read as follows:

(b) *Expiration of warranty.*—Unless an express warranty specifies a longer period of time, the warranties provided for in this subtitle expire:

(1) In the case of a dwelling completed at the time of the delivery of the deed to the purchaser, one year after the delivery or after the taking of possession by the purchaser, whichever occurs first; and

(2) In the case of a dwelling not completed at the time of delivery of the deed to the purchaser, one year after the date of the completion or taking of possession by the purchaser, whichever occurs first.

(c) *Limitation of actions.*—Any action arising under this subtitle shall be commenced within two years after the defect was discovered or should have been discovered or within two years after the expiration of the warranty, whichever occurs first.

Under Title 11 Melba is a developer. *See* § 11–101(g). The Title 11 warranties given by a developer are provided for in § 11–131 and, for purposes of the instant case, may be sufficiently stated by reference to the relevant parts of the 1981 version of § 11–131:

(a) *Application of §§ 10–202 and 10–203.*—The provisions of §§ 10–202 and 10–203 of the Real Property Article apply to all sales by developers under this title....

....

(b) *Warranty on unit from developer to owner.*—In addition to the implied warranties set forth in § 10–203 of this article there shall be an implied warranty on an

individual unit from a developer to a unit owner. The warranty on an individual unit commences with the transfer of title to that unit and extends for a period of 1 year. The warranty shall provide:

(1) That the developer is responsible for correcting any defects in materials or workmanship in the construction of walls, ceilings, floors, and heating and air conditioning systems in the unit; and

(2) That the heating and any air conditioning systems have been installed in accordance with acceptable· industry standards[.]

. . . . .

(c) *Warranty on common elements.*—(1) In addition to the implied warranties set forth in § 10–203 of this article there shall be an implied warranty on common elements from a developer to the council of unit owners. The warranty shall apply to: the roof, foundation, external and supporting walls, mechanical, electrical, and plumbing systems, and other structural elements.

(2) The warranty shall provide that the developer is responsible for correcting any defects in materials or workmanship, and that the specified common elements are within acceptable industry standards in effect when the building was constructed.

(3) The warranty on common elements commences with the first transfer of title to a unit owner. The warranty on any common elements not completed at that time shall commence with the completion of that element or with its availability for use by all unit owners, whichever occurs later. The warranty extends for a period of 3 years.

(4) A suit for enforcement of the warranty on common elements shall be brought only by the council of unit owners.

(d) *Limitation of actions.*—Notice of a defect shall be given within the warranty period and suit for enforcement of the warranty shall be brought within a year of the warranty period.

### 2. *Unit Owners*

#### a. *The Court of Special Appeals' Analysis*

In affirming dismissal of the Unit Owners' warranty claims the Court of Special Appeals reasoned that Title 10 warranties had not applied to condominiums until July 1, 1981, and that the enactment of § 11–131(a) first made §§ 10–202 and 10–203 applicable to sales by condominium developers. From this the court concluded that the one year limit on suit, measured from the end of the warranty period as provided by § 11–131(d), also applied to the warranty provisions incorporated into Title 11 from Title 10.

That premise was faulty. In *Starfish Condominium Association v. Yorkridge Service Corp.*, 295 Md. 693, 458 A.2d 805 (1983), we held that the Title 10 warranties applied to purchases of condominium units which were newly constructed private dwellings and which had been sold before Title 11 was enacted.

#### b. *Title 10*

■ Section 10–204(b) measures the one year warranty under Title 10 from different starting times, depending on whether the subject unit was completed or not at the time of delivery of the deed. Here no Unit Owner has alleged closing on a unit which was not then completed. Consequently, § 10–204(b)(1) governs and the one year warranty runs from the earlier of the delivery of the deed or the taking of possession by the purchaser.

The complaint does not advise when particular Unit Owners discovered the alleged defects and we have seen that, under the allegations, discovery by one or more unspecified Unit Owners might have been as late as May 6, 1980. Section 10–204(c), however, commences its two year limitations period with the earlier of discovery or the expiration of the warranty period.

Working backwards from September 24, 1981, as the date of filing, the earliest date on which the two year limitations period could have started and the one year warranty period

could have ended was September 23, 1979. Thus September 22, 1978, was the earliest date on which a deed could have been delivered to a Unit Owner who sued on September 24, 1981, without having that owner barred by limitations calculable from the face of the complaint. Similarly the earliest date of closing for a Unit Owner who first sued on November 23, 1981, would be November 21, 1978.

Applying those outside dates, we reverse the affirmance of the dismissal of, and shall order remand as to, counts six, eight, ten, twenty-two, thirty-eight, forty-two, fifty-four, sixty, sixty-two, sixty-six, eighty-two, and eighty-four.[9]

The complaint alleges that the ¶ 12 defects were discovered by September 18, 1978. Count four is the claim of Unit Owners based on warranty theories for the ¶ 12 defects. As to the Title 10 warranties the limitations period of two years begins with discovery and therefore expired before suit was instituted. Dismissal of count four is affirmed.

Plaintiffs do not contest the affirmance of the dismissal, on limitations grounds, of claims by Unit Owners based on Title 11 warranties.

It is appropriate to discuss at this point the "first promise" argument which the Plaintiffs base on either or both of two features in the standard contract of sale used at Antigua. Therein Melba represented that "[t]he building ... conforms substantially to the construction plans and specification...." The Repair Clause reads that the unit being sold "has been or is being constructed substantially in accordance with the construction evidence [*sic*] that Seller has fully complied with all its obligations hereunder...." Plaintiffs argue that limitations do not begin to run on an

---

**9.** Melba, as respondent, for reasons similar to those given by it as cross-petitioner and described *supra,* does not argue the issue of a nonoriginal purchaser's rights under warranty theories and that issue is not before us.

action for breach of this "first promise" in the Repair Clause until the defect is discovered so that a Unit Owner has three years thereafter within which to file suit. Under that construction of the Repair Clause it contains a "written ... promise which relates to the improvement and is made a part of the basis of the bargain between the vendor and the purchaser [which] creates an express warranty that the improvement conforms to the ... promise." RP § 10–202(a)(1). Limitations on an action for breach of the "first promise" would not be governed by the general statute of limitations but by the special statute applicable to an express warranty under Title 10. The legal effect of dividing the Repair Clause into two promises, the first of which is no more than an express warranty, would be identical with the result in this Part II. C. 2. b.

### 3. *The Council*

There is no contention that any Title 10 warranties run in favor of the Council. The Council does contend that the Court of Special Appeals erroneously affirmed dismissal of the Council's claim based on an implied warranty created by Title 11.[10] The Court of Special Appeals emphasized that the three year period of the implied warranty to a council of unit owners under § 11–131(c)(3) had begun to run "with the *first* transfer of title to a unit owner...." A suit to enforce a Title 11 warranty must "be brought within a year

---

10. The parties and the Court of Special Appeals assumed that RP § 11–131 applied to the facts of this case. There has been no challenge to this assumption and we do not decide the matter. RP § 11–142(a), effective July 1, 1981, stated in part that "[e]xcept as otherwise provided in this section, this title [the Maryland Condominium Act] is applicable to all condominiums." As of that same date § 11–142(f) read that certain sections, including § 11–131, "are applicable only to those condominiums for which a notice of intention to create a condominium is issued on or after July 1, 1981." By Ch. 2 of the Acts of 1982, an emergency measure effective March 11, 1982, § 11–142(f) was amended to read that, under certain circumstances, specified sections of the Maryland Condominium Act, including § 11–131, "do not apply to the conversion of residential rental property for which a notice of intention to create a condominium was issued before July 1, 1981[.]"

of the warranty period." § 11–131(d). The court held that the combined periods totaling four years, measured from September 17, 1977, when the first deed to a unit had been made, had expired before the Council's complaint was filed on September 24, 1981.

### a. *Articles of Transfer*

The Council maintains that its § 11–131(c) warranty claim is timely because "the first transfer of title to a unit owner" did not occur on September 17, 1977, and could not have occurred earlier than November 16, 1977. November 16, 1977, is the date of recordation with the State Department of Assessments and Taxation (the Department) of articles of transfer dated October 26, 1977, from Bankers' mortgagor, a Maryland corporation, to Melba, a New York corporation. Because Antigua is said to have been the sole asset of the transferor, the Council maintains that the deed in lieu of foreclosure from the mortgagor to Melba, which was recorded December 13, 1976, did not pass title to Antigua so that Melba could not have passed title to any owner of a unit until articles of transfer were executed and filed. Consequently, says the Council, its suit instituted on September 24, 1981, was within the four years provided by § 11–131(c) and (d).

The third amended complaint, which is the pleading before us and as to which Melba's motion to dismiss was granted, does not allege any of the facts relied on in the Council's argument. The original bill of complaint by the Council and others did contain those allegations and incorporated a certified copy of the articles of transfer. After the circuit court ordered the two suits brought against Melba to be rearranged, the allegations concerning articles of transfer apparently were made in the equity action and disappeared from the series of amended complaints in the action now before us. The original complaint nevertheless remains a part of the trial court's record in this action and has been transmitted to us. Further, the circuit court in a December 2, 1983, memorandum opinion ruling on demur-

rers to the amended complaint considered and rejected the Council's articles of transfer argument. The Court of Special Appeals considered and rejected the argument. Melba's brief to us addresses the argument on the merits and does not object on procedural grounds. Under these circumstances Melba has waived any procedural irregularity involved in the Council's reference to facts alleged only in the original complaint when appealing dismissal of the third amended complaint.

The reasons given by the Court of Special Appeals for rejecting the Council's argument reflect Melba's position and the analysis of the trial court as well.

We disagree with this argument. The purpose of the filing requirements is to insure that creditors are properly informed of the sale or disposition of all or substantially all of a debtor's assets. We decline to extend to [Plaintiffs], who were not creditors of [the mortgagor], the windfall of being able to take advantage of this technical flaw in a context wholly unrelated to that intended by the legislature. To do otherwise would be to interpret the statute in a manner entirely different from its reasonable meaning....

Title to each unit was transferred, within the meaning of § 11–131(b),[11] when Melba executed and delivered a deed for that unit to the purchasers thereof. Melba's failure to file Articles of Transfer may have created a cloud on the titles but did not prevent title from passing. The § 11–131(b) warranties and limitations are triggered by transfer of title, not transfer of perfect title. The requirements of Md. Corps. & Ass'ns Code Ann. § 3–107 do not extend the statutes of limitations applicable to [Plaintiffs'] claims. [65 Md.App. at 752–53, 501 A.2d at 1373.]

---

**11.** The reference to § 11–131(b) reflects the fact that in the Court of Special Appeals Unit Owners as well as the Council argued for Title 11 warranties.

Under the Maryland General Corporation Law, in effect both currently and in 1977, a corporation which desires to transfer assets out of the ordinary course of business generally must obtain stockholder approval by the extraordinary vote of two-thirds. Md.Code (1975, 1985 Repl.Vol.), §§ 3–104(a)(1) and 3–105(d) of the Corporations and Associations Article (CA). In that event, articles of transfer are to be filed with the Department. CA § 3–107. Those articles must include the nature and amount of the consideration to be paid for the assets. CA § 3–109(d)(1). Where, as here, the transferor is a Maryland corporation the earliest time when articles of transfer can become "effective" is the date on which the Department accepts them for record. CA § 3–113(a). "The assets of the transferor ... transfer to, vest in, and devolve on the successor to the extent provided in the articles [of transfer] without further act or deed." CA § 3–115(b)(1).

One of the important concerns underlying the articles of transfer statutes is the relationship between the corporation which is transferring assets out of the ordinary course of business and its stockholders. Not only is an extraordinary vote of stockholders required, but dissenting stockholders are also given appraisal rights. CA § 3–202(a)(3). The concern is not so much with creditors. The transferee becomes liable for the debts and obligations of the transferor only to the extent provided in the articles of transfer. CA § 3–115(c)(1). The rights of creditors of the transferor are more a matter of the law of bulk sales and of fraudulent conveyances. *See* H. Brune, *Maryland Corporation Law and Practice* § 316, at 379–80 (rev. ed. 1953).

■ Accordingly, this Court has held that a creditor of the transferor will not be heard to attack tardy compliance with the articles of transfer statutes, which impose no time limit for compliance. *See Beccio v. Tawnmore Apartments, Inc.,* 265 Md. 297, 289 A.2d 311 (1972). *Beccio* said that " 'statutes requiring numerical stockholder approval of a mortgage or transfer of substantially all of the corporate

assets are "for the protection of the stockholders and have nothing to do with the interests or rights of creditors." ' " *Id.* at 302, 289 A.2d at 314 (quoting *United States v. Jones,* 229 F.2d 84 (10th Cir.1955), *cert. denied,* 351 U.S. 939, 76 S.Ct. 835, 100 L.Ed. 1466 (1956)). In the case before us no Plaintiff is alleged to have been a stockholder of the transferor. No Plaintiff is even a creditor of the transferor. Thus, the Plaintiffs have a lesser basis than the unsuccessful creditor in *Beccio* had to invoke the articles of transfer statutes.

■ Even if the Plaintiffs had standing to assert noncompliance by Melba's transferor with the corporation statutes discussed above, the Plaintiffs' argument has no merit. Under the circumstances here, RP § 14–113 validates the deed conveying Antigua from Bankers' mortgagor to Melba. The statute provides:

Any deed by a Maryland corporation containing a certification by a corporate president or vice-president to the effect that the grant is not part of a transaction in which there is a sale, lease, exchange, or other transfer of all or substantially all of the property and assets of the corporation, shall be considered valid and effective whether or not there has been compliance with the procedures of Title 3, Subtitle 1 of the Corporations and Associations Article of the Code despite the fact the grant is in fact part of such a transaction. Any deed by a Maryland corporation, executed and recorded before January 1, 1979 is not invalid solely because of noncompliance with those procedures unless proceedings to set the deed aside were commenced on or before July 1, 1979.

This section was enacted as part of the revision of the statutes relating to real property by Ch. 349 of the Acts of 1972, effective January 1, 1973. At that time the second sentence saved deeds recorded before January 1, 1973, which were not challenged by July 1, 1973. That savings provision was extended by Ch. 286 of the Acts of 1979 to

deeds recorded before January 1, 1979, and unchallenged on or before July 1, 1979.

We considered § 14–113 in *Clerk of the Circuit Court for Dorchester County v. Chesapeake Bay Shores, Inc.,* 271 Md. 627, 319 A.2d 811 (1974). There two Maryland corporations had entered into articles of transfer on August 20, 1970, and at the same time those transferors had executed deeds to lands which were part of the assets included in the articles of transfer. The next day the transferee recorded the deeds and paid documentary stamp and transfer taxes. On November 27, 1970, the articles of transfer of August 20 were filed with the Department. We held that the tax collectors were obliged to refund the taxes associated with the recording of the deeds, saying:

> It is undisputed that neither documentary stamp nor transfer taxes may be assessed upon a written instrument which does not convey title to, *inter alia,* real property.... It is also apparent that when a Maryland corporation transfers all or substantially all of its assets, such a transfer becomes effective only when the [Department] accepts the transferor corporation's articles of transfer.... In light of these statutes, it would be difficult to reach a conclusion other than that transfer of title was effectively consummated only when the articles of sale and transfer were accepted by the [Department] on 27 November 1970. [*Id.* at 630, 319 A.2d at 813–14.]

We then addressed an argument by the tax collector which was based on § 14–113. The first sentence of that statute was not applicable to the deeds to Chesapeake Bay Shores because they did not contain certifications. We said that

> [t]he second sentence is directed to instances where there is a failure to comply with [the articles of transfer provisions of the Maryland General Corporation Law], which is not the situation here. It seems that section 14–113 ... was promulgated to promote the marketability of property, by protecting transferees where transferor corporations had either made transfers beyond the scope of [the

corporation law], or had made transfers to which [the corporation law] was applicable but had failed to comply with the requirements it imposed.

Perhaps the enactment of the statute was prompted by this Court's decision in *Isle of Thye Land Co. v. Whisman*, 262 Md. 682, 279 A.2d 484 (1971), to eliminate an inference, which one might draw from that opinion, to the effect that a transferee can never acquire valid title to property from a Maryland corporate transferor unless the latter complies fully with the provisions of [the corporation law]. [271 Md. at 632, 319 A.2d at 814–15.]

The facts in the case now before us are the converse of those in *Chesapeake Bay Shores*. There the transferor and transferee corporations executed articles of transfer to effect, *inter alia*, the intended conveyances which were merely confirmed by deed. Here the transferor corporation executed and delivered only a deed to effect the intended conveyance and the parties to the attempted conveyance did not execute articles of transfer until ten months later.

The Plaintiffs do not allege that proceedings to set aside the deed to Melba were commenced on or before July 1, 1979, so that the deed is saved by RP § 14–113 and is effective from its recording on December 13, 1976. Consequently, the "first transfer of title to a unit owner," which began the warranty period under RP § 11–131(c), is September 17, 1977.

b. *The Potterton Principle*

*Potterton v. Ryland Group, Inc.*, 289 Md. 371, 424 A.2d 761 (1981) held that an express, unconditional promise by a home builder to the homeowner to repair certain defects removed the bar created by the statute of limitations to an action on an earlier version of that promise. This was a specific application of the principle that

either an express unconditional promise to pay a subsisting debt, a conditional promise to pay such a debt if there is evidence to show that the condition has been performed, or an acknowledgment of such a debt from which

a promise to pay may be implied, removes the bar created by the statute of limitations and revives the debt. [*Id.* at 375, 424 A.2d at 763.]

 In the instant matter the Plaintiffs contend that Melba's May 6, 1980, letter operates under *Potterton* to remove any limitations bar insofar as repairing leaks and water damage is concerned. We have quoted from the *"Waterproofing"* section of that letter in Part I, *supra.* In that letter Melba also had refused to recognize any responsibility for other categories of alleged defects therein discussed and then said, "We further feel that the warranty work which has been on going for quite some time extended far beyond our legal obligation." Thus, the May 6 letter is not the kind of unqualified acknowledgment of a legal obligation which falls within the *Potterton* principle.

### c. *Incomplete Common Elements*

 RP § 11–131(c)(3) provides that the warranty running to a council "on any common elements not completed at [the time of first transfer of title to a unit owner] shall commence with the completion of that element or with its availability for use by all unit owners, whichever occurs later." The Council argues that certain common elements at Antigua which are described in Art. VII of the condominium declaration, were not completed until within four years of suit.[12] The declaration of condominium regime is dated

_____

12. The Antigua declaration, Art. VII, reads:
 AMENDMENT FOR CERTAIN IMPROVEMENTS
 Developer is presently in the process of constructing certain improvements to the common elements of the condominium being in ground planter box in the pool area, a trellis over the entrance to the pool deck, windows in formerly open areas near stairs (all floors, bracing of pool deck fence, a central traffic island with planters in the atrium and decking in two beach front bays). Said improvements are not complete and are not reflected on the condominium plat recorded herewith. Upon completion, Developer will execute and record an amendment hereto and such additions to the condominium plat as may be requisite to reflect such additions. Such amendment shall not require execution by any owner of a unit in the Antigua other than Developer.

July 25, 1977, and is an exhibit to the complaint. We cannot determine from the complaint whether the described common elements were completed. Consequently the complaint does not reveal a bar to a claim under RP § 11–131(c) for damages as to the common elements described in Art. VII. It was error to dismiss count two of the complaint.

### III. *The Claim Against Bankers*

Bankers' motion to be dismissed from the second amended complaint was granted. That complaint, stripped to its essential facts, said that Bankers had directed that the deed in lieu of foreclosure be made to Melba and that Bankers was the recipient of the net sales proceeds of the condominium units at Antigua. The complaint further alleges

[t]hat BANKERS due to its absolute control and direction of Melba gained an unjust advantage over both the rights of the individual Antigua Unit Owners and the rights of the Antigua Council of Unit Owners to enforce their paramount equity as to the numerous breaches of warranties both express and implied, and due to numerous violations of building codes suffered by Antigua and the Unit Owners.

The Plaintiffs do not allege any ground of Bankers' liability to them which is independent of Melba's alleged liability to them. The entire thrust of the allegations against Bankers is an attempt to reach Bankers through piercing the corporate veil of Melba. To succeed on that claim the Plaintiffs would have to show that Bankers' use of Melba worked a fraud against the Plaintiffs or deprived the Plaintiffs "of an equity which requires enforcement, and which is paramount to the ordinary expectation of limited liability on the part of the shareholder of [Melba]." *Starfish Condominium, supra,* 295 Md. at 714, 458 A.2d at 816.

General or conclusory allegations of fraud are insufficient. A plaintiff must allege facts which indicate fraud or from which fraud is necessarily implied. *See Wooddy v.*

*Wooddy,* 256 Md. 440, 261 A.2d 486 (1970); *Parish v. Maryland & Virginia Milk Producers Association,* 250 Md. 24, 242 A.2d 512 (1968); *Brack v. Evans,* 230 Md. 548, 187 A.2d 880 (1963); *Bachrach v. Washington United Cooperative, Inc.,* 181 Md. 315, 29 A.2d 822 (1943). Merely alleging an "unjust advantage" to Bankers and a "paramount equity" to the Plaintiffs is legally inadequate.

▇▇ In their third amended complaint (the revised second amended), filed after Bankers had been dismissed and further amendment as to Bankers had been prohibited, the Plaintiffs added additional allegations against Bankers. This was improper. The additional allegations are not before us on the appeal from the dismissal of the claim made against Bankers in the second amended complaint. In order properly to have placed the additional allegations before us, the Plaintiffs should have tendered the additional allegations as to Bankers to the circuit court and moved that the judgment against Bankers be reopened to permit further amendment. If that request were denied, it would be open for the Plaintiffs to argue on appeal after final judgment that that denial was an abuse of discretion.

Even if the additional allegations were properly before us, we would find no error in the dismissal of Bankers. The additional allegations were:

> That all of the managing officers, directors and employees directing the affairs of Melba were at all times employees of BANKERS, paid by BANKERS, with all employee benefits approved by BANKERS housed in BANKERS offices and furnished with identification cards of BANKERS which cards identified the carrier as BANKERS employees, and which employees were directed in all their activities by BANKERS supervisory personnel.

In *Starfish* the subsidiary corporation was the service company of the parent savings and loan. The subsidiary operated out of the offices of the parent using persons on the

payroll of the parent. That was not fraud in *Starfish* and it is not fraud here.

## IV. *Summary*

All odd numbered counts and counts two, six, eight, ten, twenty-two, thirty-eight, forty-two, fifty-four, sixty, sixty-two, sixty-six, eighty-two, and eighty-four are remanded. Dismissal of the following counts is affirmed: four, twelve, fourteen, sixteen, eighteen, twenty, twenty-four, twenty-six, twenty-eight, thirty, thirty-two, thirty-four, thirty-six, forty, forty-four, forty-six, forty-eight, fifty, fifty-two, fifty-six, fifty-eight, sixty-four, sixty-eight, seventy, seventy-two, seventy-four, seventy-six, seventy-eight, eighty, eighty-six, eighty-eight, ninety, ninety-two, and ninety-four.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT FOR REMAND TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–HALF BY THE PETITIONERS AND ONE–HALF BY THE RESPONDENT, MELBA INVESTORS ATLANTIC, INC.

### Appendix A

#### Appellants' Dates of Deed

| Appellant | Date of Deed |
| --- | --- |
| Daily | 9/17/77 |
| Dolan | 9/17/77 |
| Richards | 9/19/77 |
| Lenet | 9/24/77 |
| Vasquez | 9/24/77 |
| Lacy | 10/1/77 |
| Gilligan | 10/15/77 |
| F. Schoenbrodt | 10/15/77 |
| M. Schoenbrodt | 10/15/77 |
| Jaison | 10/29/77 |
| Reiss | 10/29/77 |
| Marsalak | 12/1/77 |
| Friedenberg | 12/5/77 |
| Huber | 12/13/77 |

### Appendix A

#### Appellants' Dates of Deed

| Appellant | Date of Deed |
|---|---|
| Wrist | 1/5/78 |
| Ralbovsky | 1/30/78 |
| Melitis | 4/14/78 |
| Swerdlin | 5/5/78 |
| Savitt | 5/26/78 |
| Hale | 6/7/78 |
| Kainer | 6/16/78 |
| Tuller | 6/30/78 |
| Lou | 7/10/78 |
| Moore | 7/21/78 |
| Nugyen | 7/28/78 |
| Green/Phebus | 8/18/78 |
| Reibner | 9/1/78 |
| Fisher | 9/8/78 |
| Clifford | 9/15/78 |
| Karouge | 9/28/78 |
| Cole | 9/?/78 |
| Schrader | ? |
| Mayer | 1/19/79 |
| Jordon | 6/1/79 |
| *Balan | 8/2/80 |
| *Boone/Sampogna | 12/24/80 |
| *Butler | 5/23/81 |
| *Dubroof | 1/10/79 |
| *Kulczycki | 1/29/79 |
| *Kzrian | 9/18/78 |
| *Nemec | 9/29/80 |
| *Newhouse/Fidel | 3/22/81 |
| *O'Brien | 4/23/81 |
| *Stallings | 9/27/80 |
| *Harris | 8/29/79 |
| *Rider | 1/22/81 |

*Denotes Non-Original Purchaser